**FIN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **JOHN A. ASSALONE,** *et al.*, | : **CIVIL ACTION NO. 1:12-CV-2395** |
| | : |
| **Plaintiffs** | : **(Chief Judge Conner)** |
| | : |
| **v.** | : |
| | : |
| **S-L DISTRIBUTION COMPANY, INC.,** | : |
| **f/k/a SOH DISTRIBUTION COMPANY,** | : |
| **INC.,** | : |
| | : |
| **Defendants** | : |

## MEMORANDUM

Presently before the court in the above-captioned matter is a motion (Doc. 33) to dismiss the second amended complaint (Doc. 31), pursuant to Federal Rule of Civil Procedure 12(b)(6), filed by defendant S-L Distribution Company, Inc., f/k/a SOH Distribution Company, Inc. ("S-L Distribution"). The motion is fully briefed and the issues are ripe for disposition. For the reasons that follow, the court will grant S-L's motion in its entirety and dismiss plaintiffs' second amended complaint without prejudice.

## I.    Factual and Procedural History

The instant matter involves the alleged breach of certain distributorship agreements entered into between S-L Distribution and plaintiff John A. Assalone, John Carbone, Richard C. Cook, ENL Snacks Inc., Kenneth M. Geiger, John Jobst, James Levergne, Joseph Mandaro, Scott A. Martello, Martguy Inc., Roy E. Milligan, Craig M. Mollenhauer, James P. Mullholland, David Oliva d/b/a DMO Trucking, David Orgel, Rosario (Russell) Pitta d/b/a R&K Snacks, Robert W. Skidmore, Spare

Time Inc., and Footer, Inc. (collectively, "plaintiffs").[1] Plaintiffs are independent operators who distribute snack products in the greater New York metropolitan area. (Doc. 31, ¶¶ 1-18). Each plaintiff maintains a distributor agreement with S-L Distribution, and it is the scope of that agreement which is at issue in this litigation. (Id. at ¶¶ 76-92).

In approximately March of 1999, Snyder's of Hanover, Inc. ("Snyder's"), a snack food manufacturer and distributor, assigned its entire distribution business and all then existing distributorship agreements to SOH Distribution Company, Inc. ("SOH Distribution"). (Id. at ¶¶ 19-20). SOH Distribution is a wholly-owned subsidiary of Lance, Inc. ("Lance"), which also manufactures and distributes snack foods. (Id. at ¶¶ 19-20). On July 21, 2010, Snyder's entered into a triangular merger agreement with Lance. (Id. at ¶ 20). Pursuant to that agreement, Lance formed a shell corporation to merge with Snyder's, and thereafter, Snyder's continued as the surviving entity, operating as a wholly owned subsidiary of Lance. (Id.). Lance changed its name to Snyder's-Lance to reflect its new corporate structure, and SOH Distribution became known as S-L Distribution. (Id. at ¶¶ 20-21). S-L Distribution is a primary distributor of Snyder's-Lance products. (Id. at ¶ 21).

---

[1] S-L Distribution is a business entity incorporated in Delaware, maintaining its principal office in Hanover, Pennsylvania, (Doc. 31, ¶ 21), and all Distributors are individuals and business entities residing in or organized under the laws of New York. Jurisdiction is thus proper based on 28 U.S.C. § 1332.

Prior to the merger, each plaintiff entered into a distributor agreement of indefinite duration with Snyder's or SOH Distribution.[2] Plaintiffs allege that these agreements, in conjunction with a course of dealing between the parties, "granted each Plaintiff the *exclusive* right to sell and distribute" certain products in the New York metropolitan area. (Id. at ¶ 28) (emphasis added). Culled to its essence, resolution of the matter *sub judice* turns entirely on whether plaintiffs' exclusivity allegations are supported by the language of the agreements.

Although plaintiffs quote extensively from the various distributor agreements throughout the amended complaint, plaintiffs have not attached those agreements as exhibits for the court's consideration. S-L Distribution, however, has attached a copy of each agreement to its motion to dismiss, (see Doc. 33, Exs. A-E), asserting that the court may and should consider the agreements themselves in ruling on its motion. (Doc. 33, ¶ 7 & n.2 (quoting In re Burlington Coat Factories Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997) ("A document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment."))). Consistent with Burlington, because the vast majority of plaintiffs' quotations are "clearly derived" from the agreements themselves, see DiFelice v. Aetna U.S. Healthcare, 346 F.3d 442, 444 n.2 (3d Cir. 2003), the court will consider all relevant portions of the actual distributorship agreements in ruling on defendant's motion.

---

[2] There are fifteen separate agreements in total, varying slightly in terms and form. (Doc. 31, ¶ 29).

Although some of the language used in the agreements varies depending on when they were executed, the most important provision for purposes of the instant motion remains largely unaltered in each iteration, granting each distributor "the exclusive right to sell and distribute Authorized Products to Authorized Outlets within the Territory . . . for   as long as [SOH Distribution/Snyder's] continues to do business in the Territory." (Doc. 33-1 at 3, 13, 30, 47; Doc. 33-2 at 7, 23, 40, 58; Doc. 33-3 at 17, 34, 51; Doc. 33-4 at 10, 27, 44; Doc. 33-5 at 3; Doc. 33-6 at 3; Doc. 33-8 at 4). With the exception of the agreement executed by Snyder's and Spare Time Inc., which grants only "the right to sell and distribute products in the Territory," (Doc. 33-7 at 3), all agreements contain this exclusivity provision.

Most variations of the agreement define "Authorized Products" as:

> those snack food items now or hereafter sold under the
> name and trademark [Snyder's] or other trade names for
> which [SOH Distribution] has exclusive distribution
> rights within the Territory, all of which shall specifically
> be identified as Authorized Products, from time to time,
> on the Price List."

(Docs. 33-1 at 2,11,28, 45; Doc. 33-2 at 5, 21, 38, 56; Doc. 33-3 at 15, 32, 49; Doc. 33-4 at 8, 25, 42).  Other agreements define Authorized Products as "those pretzel, potato chip, corn chip, popcorn and other snack food items now or hereafter sold under the name and trademark of [Snyder's] which are identified as Authorized Products from time to time on the Price List," (Doc. 33-5 at 2); "all pretzels, potato chips, corn chips, corn or cheese snacks, popcorn, now or hereafter sold under the name and trademark [Snyder's] . . . [which] shall be identified on the Price List as Authorized

4

Products," (Doc. 33-6 at 3); "those pretzel, potato chip, corn chip, popcorn and other snack food items which are specifically identified . . . on the Price List, which shall include, but are not limited to, items sold under the names and/or trademarks of Snyder's," (Doc. 33-7 at 2); and "all potato chips, pretzels, corn chips, corn or cheese snacks, popcorn, peanuts and related snack-type product . . . now or hereafter sold under the name and trademark of [Snyder's] or any other tradename or trademark owned or used exclusively by [Snyder's]." (Doc. 33-8 at 3).

The agreements also contained varying definitions of the term "Price List," with the majority of agreements defining it as follows:

> that document published by SOH from time to time entitled "Contract Sales Retail Price List." This document identifies all products that SOH has available, from time to time, for purchase by Distributor, the Distributor's cost for each product and the DSD Unit Price for each product. The DSD Unit Price is the suggested sales price to Distributor's customers. Distributor hereby agrees and understands that the Price List may be changed, from time to time, by SOH, upon fifteen (15) days notice to Distributor.

(Doc. 33-1 at 12, 29, 46; Doc. 33-2 at 6, 22, 39, 57; Doc. 33-3 at 16, 33, 50; Doc. 33-4 at 9, 26, 43; Doc. 33-5 at 3; Doc. 33-7 at 2). Still other agreements use the term "Price List" but fail to define it, (see Docs. 33-1; Doc. 33-6), or make no reference to it whatsoever. (Doc. 33-8). All agreements with the exception of those executed with Mandaro (Doc. 33-5), Pitta (Doc. 33-6), and Levergne (Doc. 33-8) further provided that S-L Distribution has the authority to, *inter alia*, remove Authorized Products from the Price List, cease to supply an Authorized Product, or change a product's designation from Authorized Product to Other Product. (Doc. 33-1 at 2, 11, 28, 45;

Doc. 33-2 at 5, 21, 38, 56; Doc. 33-3 at 15, 32, 49; Doc. 33-4 at 8, 25, 42; Doc. 33-7 at 2).

Prior to the merger, and pursuant to the agreements, Snyder's and SOH

Distribution "paid for and maintained four linear feet of shelf space" in all

authorized outlets in the New York metropolitan area. (Doc. 31 at ¶ 61).

With respect to product exclusivity, Plaintiffs allege that "[p]ursuant to the

Distributor Agreements, and as is customary in the industry, every time [Snyder's]

and [SOH Distribution] became authorized to distribute a new product," plaintiffs

too "automatically acquired" an exclusive right to distribute that product in their

designated territories. (Id. at 62). As an example, plaintiffs aver that when Snyder's

launched a new product, Grande Tortilla Chips, in 2009, plaintiffs were directed to

distribute the product within their territories. (Id.). The same is true of Snyder's

acquisition of Krunchers! brand kettle cooked potato chips; plaintiffs were given

the product for distribution immediately. (Id.).

After the merger, the Snyder's-Lance portfolio included "combined 'core'

brands" such as Snyder's pretzels, Lance sandwich crackers, and Cape Cod potato

chips, in addition to "combined 'allied' brands," including Jay's brand potato chips,

Krunchers! brand kettle cooked potato chips, O-Ke-Doke brand popcorn, Grande

brand and Padrinos brand tortilla chips, Eat Smart Naturals brand vegetable chips,

Tom's brand snacks, Archway cookies, and Stella D'oro brand cookies. (Id. at 64).

All distributor agreements were assigned to S-L Distribution following the merger,

and, according to plaintiffs, all distributors then "acquired the exclusive rights to

distribute" the entire Snyder's-Lance portfolio of brands. (Id. at 65). Plaintiffs

"understood that Lance brand products, Cape Cod brand products and other products would be available for their distribution in the New York metropolitan area." (Id. at 31).

As support for this assertion, Plaintiffs have attached to their amended complaint a memorandum dated January 30, 2012, directed to plaintiffs, which indicates that because three Cape Cod Whole Grain products were being moved from the mainstream section to the natural snacks section in all accounts, Snyder's-Lance "would need to distribute the items on our S-L routes to maintain continuity in the section and avoid adding additional distributors to this unique set." (Doc. 31-1 at 1). The memo also provides that the "move should not be interpreted to have any meaning beyond the above-stated," noting that Snyder's-Lance "will continue to distribute the remainder of all items in our existing distribution configuration, utilizing S-L routes as well as maintaining current relationships with 3rd party distributors." (Id.).

On July 12, 2012, plaintiffs received an updated Price List from Snyder's-Lance which indicated that the remaining Cape Cod products and other Lance items "were excluded from the New York metropolitan area." (Doc. 31 at ¶ 69). Specifically, the "Exception List for Specific Geographic Areas/Zones" attached to the Price List provides that distributors in the New York metropolitan area are not authorized to carry the following Lance brands: Bass Pro, Cape Cod, Don Pablos, Jays, Lance, O-Ke-Doke, Stella D'oro, and Tom's (collectively, "Snyder's-Lance products"). (Doc. 31-2 at 10). Some time thereafter, however, several excepted

products, including Lance nut products, were "rolled over" to plaintiffs' accounts. (Doc. 31 at ¶ 70). With these few exceptions, the remainder of the Snyder's-Lance products are distributed by third-party distributors. (Id. at 71). According to the plaintiffs, this violation of their contractual rights to exclusively distribute certain Cape Cod and Lance products has resulted in shelf-space reallocation at Authorized Outlets, with Snyder's-Lance distributors losing valuable retail shelf space to the third-party distributors carrying Cape Code and other Lance products. (Id. at ¶ 72). Plaintiffs also contend that Snyder's-Lance has marketed the Cape Cod and Lance products more aggressively than products available to plaintiffs, to their financial detriment. (Id. at ¶ 73).

Plaintiffs commenced this action on November 30, 2012, with the filing of a complaint. (Doc. 1). S-L Distribution timely responded with a motion (Doc. 8) to dismiss, which was mooted by plaintiffs' filing of a first amended complaint (Doc. 19) on February 19, 2013. Pursuant to a stipulation of counsel, on April 18, 2013, plaintiffs filed the now-operative second amended complaint. (Doc. 31). Therein, plaintiff asserts claims for breach of contract (Count I) and declaratory judgment (Count II) premised on S-L Distribution's alleged violation of the exclusivity clauses in plaintiffs' respective distributorship agreements. S-L Distribution moves for dismissal of both claims pursuant to Federal Rules of Civil Procedure 12(b)(6). The motion has been fully briefed (Docs. 36, 37, 39) and is ripe for disposition.

## II.    <u>Standard of Review</u>

Federal notice and pleading rules require the complaint to provide "the defendant notice of what the . . . claim is and the grounds upon which it rests." <u>Phillips</u>, 515 F.3d at 232 (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007)). To test the sufficiency of the complaint in the face of a Rule 12(b)(6) motion, the court must conduct a three-step inquiry. <u>See</u> <u>Santiago v. Warminster Twp.</u>, 629 F.3d 121, 130-31 (3d Cir. 2010). In the first step, "the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'" <u>Id.</u> (quoting <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 675 (2009)). Next, the factual and legal elements of a claim should be separated; well-pleaded facts must be accepted as true, while legal conclusions may be disregarded. <u>Id.</u>; <u>see</u> <u>also</u> <u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 210–11 (3d Cir. 2009). Once the well-pleaded factual allegations have been isolated, the court must determine whether they are sufficient to show a "plausible claim for relief." <u>Iqbal</u>, 556 U.S. at 679 (citing <u>Twombly</u>, 550 U.S. at 556); <u>Twombly</u>, 550 U.S. at 555 (requiring plaintiffs to allege facts sufficient to "raise a right to relief above the speculative level"). A claim "has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Iqbal</u>, 556 U.S. at 678. When the complaint fails to present a prima facie case of liability, however, courts should generally grant leave to amend before dismissing a complaint. <u>See</u> <u>Grayson v. Mayview State Hosp.</u>, 293 F.3d 103, 108 (3d Cir. 2002); <u>Shane v. Fauver</u>, 213 F.3d 113, 116–17 (3d Cir. 2000).

## III.   **Discussion**

Under Pennsylvania law, which the parties agree governs the agreements at issue, (Doc. 36 at 6; Doc. 37 at 8) to state a claim for breach of contract, plaintiffs must plead facts establishing: (1) the existence of a contract, including its essential terms; (2) defendant's breach of duty imposed by that contract; and (3) actual loss or injury as a result of that breach.  See JML Indus. v. Pretium Packaging, LLC, 2007 U.S. Dist. LEXIS 491 at *4 n.3, *14 (M.D. Pa. Jan. 5, 2007) (citing Omicron Sys. v. Weiner, 860 A.2d 554, 564 (Pa. Super. Ct. 2004)).  In the matter *sub judice*, no party disputes the existence or validity of the agreements—instead, the parties dispute the essential terms of the contract and whether those terms are unambiguous.

Contract interpretation generally is a question of law, tasking the court to discern the respective parties' intents through the prism of the written agreement. Dep't of Transp. v. Pa. Indus. for the Blind and Handicapped, 886 A.2d 706, 711 (Pa. Commw. Ct. 2005).  When a contract's language is ambiguous, or "subject to more than one reasonable interpretation when applied to a particular set of facts," parol evidence may be admitted to determine the parties' intents.  Murphy v. Duquesne Univ., 777 A.2d 418, 429 (Pa. 2001) (also defining an ambiguous term as one that "is reasonably susceptible of different constructions and capable of being understood in more than one sense").  Absent any ambiguity, the plain language of the agreement, as written, must be interpreted and enforced by the court. See Gene & Harvey Builder's, Inc. v. Pa. Mfr.'s Ass'n Ins. Co., 517 A.2d 910, 913 (Pa. 1986).

## A.     Exclusivity as to Spare Time Inc.

As a threshold matter, the court will address S-L Distribution's argument that Spare Time's agreement is unambiguous, and distinguishable from the other plaintiffs' contracts, in that it is devoid of any exclusivity language whatsoever. (Doc. 36 at 7-8) ("[S-L Distribution grants to Distributor the right to sell and distribute Products in the Territory"). S-L Distribution posits that an exclusivity clause is a material and oft bargained-for provision in distributorship agreements and that the absence of such a clause in Spare Time Inc.'s agreement renders its contract unambiguous.  According to S-L Distribution, exclusive distributorship rights, or for that matter any exclusive contractual right, are only available if the contract contains explicit, unequivocal language conferring such a right.  (Id.).

S-L Distribution cites three cases to support its position that a contract silent as to exclusivity cannot be interpreted to grant exclusive rights.  First, S-L Distribution cites Szemis v. Szlachta, 93 A.2d 892, 893 (Pa. Super. Ct. 1953), a case from the Pennsylvania Superior Court observing that, in a real estate brokerage relationship, "a broker can acquire an exclusive right of sale only by a contract conferring such authority 'in unequivocal terms or by necessary implication." Id. Next, S-L Distribution directs the court to Mele v. TSE Systems, 2010 U.S. Dist. LEXIS 52876, *25 (E.D. Pa. May 27, 2010), where the court observed that language obligating the plaintiff to act as "the primary, but not exclusive," salesman within a territory did not create an exclusive right.  Id.  And finally, S-L Distribution cites to Medtronic Sofamor Danek U.S.A., Inc. v. Globus Medical, Inc., 637 F. Supp. 2d 290,

308-09 (E.D. Pa. July 17, 2009), where the court held that, because the plaintiff was only appointed as "a" distributor of a patented product, not the "sole" distributor, its right was not exclusive for standing purposes in a patent infringement case. Id. Aside from S-L Distribution's selective quotation, which in isolation appears apt, the agreements in each of these cases, involving patents and real estate brokers, and at least one of which expressly defined the relationship as "non-exclusive," are largely distinguishable from the matter before the court.

More compelling, however, is S-L Distribution's reliance on Dahath Electric Co. v. Suburban Electric Development Co., 2 A.2d 765 (Pa. 1938), a case involving a distributorship agreement decided by the Pennsylvania Supreme Court and, thus, binding upon this court. The court in Dahath, presented with a distributor making the same argument as Spare Time *sub judice*, observed:

> If an exclusive agency in the territory covered was to be created, the thing which strikes one most forcibly after reading the contract is that, although it is a business agency agreement, entered into by business men, nothing is mentioned about the exclusiveness of the agency. The words "exclusive" or "sole," in defining the agency, are not used, and yet plaintiff's representatives who negotiated the contract, would, it appears to us, be keen to see that one or the other of these words was used in the agreement, if the parties intent was to create an exclusive agency for the territory, and would not have left this most important feature of their understanding to implication and, to say the least, in doubt.

Dahath, 2 A.2d at 766. Importantly, as S-L Distribution emphasizes, Dahath has been endorsed by the Third Circuit Court of Appeals in Mellon Bank Corp. v. First Union Real Estate Equity & Mortgage Investors, 951 F.2d 1399 (3d Cir. 1991), where

the panel rejected the plaintiff's contention that an exclusive agency was intended by the parties even though "nothing [was] mentioned about the exclusiveness of the agency" in the contract. Id. at 1412 (quoting Dahath, 2 A.2d at 766). Relying on Dahath, defendants posit that plaintiffs attempt to manufacture an ambiguity must fail given the agreement's silence as to exclusivity.

In response, plaintiffs cite to Viceroy Fluid Power International, Inc. v. Banks Engineering Co., 580 F. Supp. 725 (W.D. Pa. March 8, 1988), where, as here, plaintiff and defendant were parties to a distributorship agreement which granted sales rights to a specified territory but did not state whether that right was exclusive. Id. at 726-27. The district court held that the agreement's failure to "state whether the distributorship is exclusive or not" rendered the agreement ambiguous, opening the door for a jury to consider parol evidence in order to discern the parties' intent. Id. at 727. Relying on Viceroy, plaintiffs urge the court to declare this a classic case of latent ambiguity, ultimately permitting the jury to consider extrinsic evidence as to exclusivity.

The precedential value of Viceroy is limited, however, and ultimately defeated by the binding decisions of Pennsylvania's highest court, compelling the opposite result. See Dahath Electric Co., 2 A.2d at 766. Indeed, the Dahath theme is pervasive throughout several decisions of the Commonwealth's courts, and has not been limited to distributor agreements, reflecting the Dahath court's supposition that a right as substantial as exclusivity, if intended, must be expressly stated. E.g. Home Builders of Mercer Cnty. v. Dellwood Corp., 108 A.2d 731, 257-58 (Pa. 1954)

(refusing to read "sole and exclusive" into franchise contract that was otherwise silent as to exclusivity); <u>Szemis</u>, 93 A.2d at 893 (same, in real estate brokerage contract); <u>Mellon Bank</u>, 951 F.2d at 1412 (same, in lease-purchase agreement); <u>BP Envtl. Servs. v. Republic Servs.</u>, 2013 U.S. Dist. LEXIS 71536, *14-15 (E.D. Pa. May 21, 2013) (same, in waste disposal contract). The parties do not dispute that the agreements before the court, including Spare Time's agreement, are governed by the laws of the Commonwealth, and the overwhelming weight of authority provides: when an agreement is silent as to exclusivity, that agreement is neither ambiguous nor exclusive. For this reason, the court must reject <u>Viceroy</u> and conclude that Spare Time's agreement, silent as to exclusivity, is non-exclusive as a matter of law.

**B.    Scope of Remaining Plaintiffs' Exclusive Rights**

Having concluded that Spare Time's agreement is non-exclusive, the court turns to the remaining plaintiffs' core allegation: that S-L Distribution expressly granted to them, and openly violated, the exclusive right to distribute the full line of Snyder's-Lance products within their various territories. (<u>See</u> Doc. 31 at ¶ 62 ("Pursuant to the Distributor Agreements, and as is customary in the industry, every time [Snyder's] became authorized to distribute a new product, [plaintiffs] automatically acquired the exclusive right to distribute that product in their respective territories.")). Confronted with the express language of their respective agreements, which do not contain an explicit, global license to distribute the entire Snyder's-Lance portfolio, plaintiffs change course, conceding that their rights extend only to Authorized Products but suggesting that the definition of that term

14

is ambiguous at best. (Doc. 37 at 12-13 ("While it is undisputed that the Agreements grant the [plaintiffs] the exclusive right of unlimited duration to sell and distribute Authorized Products . . . within their designated Territories, paragraphs which define Authorized Products and address distribution of new products are at best ambiguous."). S-L Distribution responds that the term Authorized Products is clearly defined by the agreements and does not include the full line of Snyder's-Lance products.  (Doc. 36 at 8-9).

As a threshold matter, the court notes that, contrary to plaintiffs' implicit suggestion, the mere existence of a dispute between the parties as to a particular term's meaning does not *ipso facto* imply an ambiguity precluding the court from interpreting the contract as a matter of law.  See Stewart v. Swepi, 918 F. Supp. 2d 333, 341-42 (M.D. Pa. Jan. 16, 2013) (quoting Baney v. Eoute, 784 A.2d 132, 136 (Pa. Super. Ct. 2001)).  Instead, the court must look to the language of the agreement and, if the terms of the contract are clear from the plain meaning of the language used, the court must divine the term's meaning from the agreement itself. Stuart v. McChesney, 444 A.2d 659, 661 (Pa. 1982).  Bearing these standards in mind, the court addresses each of S-L Distribution's arguments *seriatim*.

### 1.    Authorized Products

As noted previously, most iterations of the agreement define "Authorized Product" as those snack food items "now or hereafter sold under the name and trademark of [Snyder's] or other trade names for which [SOH Distribution] has exclusive distribution rights within the Territory, all of which shall specifically be

identified as Authorized Products, from time to time, on the Price List." (Docs. 33-1 at 2,11,28, 45; Doc. 33-2 at 5, 21, 38, 56; Doc. 33-3 at 15, 32, 49; Doc. 33-4 at 8, 25, 42). The remaining agreements contain similar language, defining Authorized Products as products "now or hereafter sold under the trademark of [Snyder's]" which "are" or "shall be" identified on the Price List. (Doc. 33-5 at 2; Doc. 33-6 at 3; Doc. 33-8 at 2). Neither side appears to consider these slight variations to be material, as both the plaintiffs and S-L Distribution refer collectively to all agreements throughout their briefs. In the court's view, the distinction is significant in the sense that it impacts the court's construction of the contractual language. Ultimately, however, we reach the same conclusion as to both versions of the agreement.

Each variation of the agreement provides, at minimum, that an Authorized Product is one that bears the Snyder's trademark. (See Doc. 33-5 at 2; Doc. 33-6 at 3; Doc. 33-7 at 3). Despite plaintiffs' conclusory allegation that this language is ambiguous, the court discerns no ambiguity whatsoever: the language quite clearly states that a product is not an Authorized Product unless, *inter alia*, it bears the Snyder's trademark. (Id.). By plaintiffs' own admission, the Snyder's- Lance products they now seek to distribute are each separately trademarked and thus by necessary deduction do not bear the Snyder's trademark. (Doc. 31 at ¶ 20 (Snyder's-Lance portfolio includes the following trademarks: Snyder's®, Lance®, Cape Cod®, Krunchers!®, Jays®, Tom's®, Archway®, Grande®, Stella D'oro®, O-Ke-Doke®, EatSmart®, and Padrinos®). Thus, as to plaintiffs Mandaro, Pitta, and Levergne, distributor plaintiffs whose agreements define Authorized Product as one bearing

16

the Snyder's trademark, there is no ambiguity as to whether these plaintiffs are authorized to distribute the separately-trademarked Snyder's-Lance products. As a matter of law, they are not. The court must thus dismiss plaintiffs' complaint to the extent it pertains to plaintiffs Mandaro, Pitta, and Levergne.

We turn then to the remaining plaintiffs, whose agreements offer a broader definition of Authorized Products to include those bearing a Snyder's trademark or another trademark for which Snyder's or S-L Distribution have acquired exclusive distribution rights. (Docs. 33-1 at 2,11,28, 45; Doc. 33-2 at 5, 21, 38, 56; Doc. 33-3 at 15, 32, 49; Doc. 33-4 at 8, 25, 42; Doc. 33-8 at 3). The court again can discern no unclarity in this language. See Stuart, 444 A.2d at 661. And despite the conclusory allegation of ambiguity, plaintiffs offer no alternative interpretation for the terms. (Id.). The court concludes that the definition is facially unambiguous, expressly defining the term Authorized Product to include only those products bearing a Snyder's trademark or a trademark for which Snyder's or S-L Distribution have acquired exclusive distribution rights. (Id.). Although this definition of Authorized Product is theoretically more expansive by its contemplation of non-Snyder's products, as applied to the facts pled by plaintiffs, the distinction is ultimately academic.

As noted, none of the Snyder's-Lance products that plaintiffs now seek to distribute bear a Snyder's trademark, and to that extent, even the broader agreements suffer the same fate as the narrower agreements discussed *supra*. The plaintiffs apparently concede this argument, instead contending that they satisfy

17

the second prong of this provision. (Doc. 37 at 13-14). Specifically, plaintiffs submit

that as a result of the merger, S-L Distribution and/or Snyder's acquired exclusive

distribution rights to all trademarked products in the Snyder's-Lance line. (Doc. 37

at 14-15) ("[T]he Agreements can be interpreted . . . as to provide that all products

then sold or subsequently acquired by [S-L Distribution] shall be identified as

Authorized Products and made available for plaintiffs exclusive distribution.").

The plain language of the agreements and the facts pled in the amended

complaint belie plaintiffs' suggested interpretation. The agreements provide that

Authorized Products include only those bearing trademarks which either S-L

Distribution or Snyder's itself possess the exclusive right to distribute, and no fact

or reasonable inference to be drawn from the amended complaint establishes that

either Snyder's or S-L Distribution possess exclusive distribution rights as to the

entire Snyder's-Lance product line. In fact, the amended complaint is entirely

silent in this regard.[3] The court declines to presume, simply because Snyder's and

S-L Distribution are now wholly-owned subsidiaries of a larger parent corporation,

---

[3] Plaintiffs make a single, passing reference to the trademark dispute in their
opposition papers, asserting, in conclusory fashion, that "Defendant has acquired
exclusive distribution rights with respect to the products of a combined entity
Snyder's-Lance." (Doc. 37 at 13-14). Critically, there are no facts in the amended
complaint which establish or tend to establish that S-L Distribution acquired such
rights. Facts alleged for the first time in papers opposing a Rule 12(b)(6) motion
cannot be considered by the court in ruling upon the defendants' motion. Frederico
v. Home Depot, 507 F.3d 188, 201-02 (3d Cir. 2007) (courts should "not consider
after-the-fact allegations in determining the sufficiency of complaints under Rules
9(b) and 12(b)(6)"). Hence, the court will not adopt this passing reference as a "fact"
for purposes of the instant motion.

that either entity has acquired the right to exclusively distribute all of the parent

company's products.[4]  Absent some allegation that Snyder's or S-L Distribution

acquired exclusive distribution rights as to every Snyder's-Lance trademarked

product, the court cannot conclude that the Snyder's-Lance products satisfy the

definition of Authorized Products.  For this reason, the court is compelled to grant

S-L Distribution's motion to dismiss as to the remaining plaintiffs.

Finally, and perhaps most damaging to plaintiffs' claims, is the Price List

itself, which plaintiffs have attached as an exhibit to the amended complaint.[5]  (See

Doc. 31-2).  Even if plaintiffs had alleged and could establish that S-L Distribution

had the exclusive right to distribute the Snyder's-Lance products, the distributor

agreements nonetheless unequivocally state that a product is not an Authorized

Product unless identified as such on the Price List. (Docs. 33-1 at 2,11,28, 45; 33-2 at

5, 21, 38, 56; 33-3 at 15, 32, 49; 33-4 at 8, 25, 42 (defining Authorized Product, *inter*

*alia*, as those that "shall specifically be identified as Authorized Products, from time

to time, on the Price List"); Doc. 33-5 at 2 (defining Authorized Products, *inter alia*,

---

[4] Indeed, case law warns against drawing such an inference, emphasizing that the "law recognizes the legal distinction of affiliated corporations." Mellon Bank NA v. Metro Commc'ns, 945 F.2d 635, 643 (3d Cir. 1991) ("[T]here is a presumption that a corporation, even when it is a wholly owned subsidiary of another, is a separate entity."). In light of this admonition, the court declines to make an inferential quantum leap to the presumption that the Snyder's-Lance merger conferred exclusive rights as to all Snyder's-Lance products on its subsidiary, S-L Distribution.

[5] Only one agreement, that issued to plaintiff Levergne, defines the term Authorized Product without reference to or incorporation of the Price List. (Doc. 33-8).  Consequently, this discussion does not apply to Levergne's agreement.

as those that "are identified as Authorized Products from time to time on the Price List"); Doc. 33-6 at 3 ("Authorized Products shall be identified on the Price List as Authorized Products."); Doc. 33-7 at 2 ("Product(s) shall mean those . . . which are specifically identified, from time to time, on the Price List.").  Further, the agreements expressly vest sole discretion and authority to alter the Authorized Products list, including removing items from the list or changing their designation, with S-L Distribution. (Docs. 33-1 at 2,11,28, 45; Doc. 33-2 at 5, 21, 38, 56; Doc. 33-3 at 15, 32, 49; Doc. 33-4 at 8, 25, 42; Doc. 33-7 at 2).

Plaintiffs do not dispute that the Exception List for Specific Geographic Areas/Zones, appended to and made a part of the Price List, expressly excludes the Snyder's-Lance products as Authorized Products for the New York metropolitan area, the region where plaintiffs operate.  (Id. (providing that Archway, Bass Pro, Cape Cod, Don Pablos, Jays, Lance, O-Ke-Doke, Stella D'oro, and Tom's products are not Authorized Products for plaintiffs' territory).  In fact, plaintiffs largely avoid acknowledging the Price List in their papers, arguing instead that the agreements are ambiguous as they pertain to distribution and that a jury must be permitted to consider extrinsic evidence to interpret the terms as a matter of fact. (Doc.  37 at 14-15).  This blanket allegation of ambiguity is belied by the express language of the agreements, which clearly define Authorized Product as those products identified as such by S-L Distribution on the Price List. (Docs. 33-1 at 2,11,28, 45; 33-2 at 5, 21, 38, 56; 33-3 at 15, 32, 49; 33-4 at 8, 25, 42; Doc. 33-5 at 2; Doc. 33-6 at 3; Doc. 33-7 at 2). The agreements' terms and the appended Price List being pellucidly clear, and on

their face excluding the Snyder's-Lance products as Authorized Products in plaintiffs' territories, the court rejects plaintiffs' contention that the agreements grant them exclusive distribution rights as to the entire Snyder's-Lance portfolio.

## 2.    Course of Dealing

Plaintiffs lastly assert that even if the terms of the agreements are not ambiguous as a matter of law, the parties' course of dealing supplements those terms and establishes their exclusive distribution rights as alleged. (Doc. 37 at 16-17).  Plaintiffs contend that evidence of course of dealing is always admissible in interpreting a commercial contract, regardless of whether an ambiguity exists. According to the amended complaint, the parties' course of dealing was such that whenever S-L Distribution acquired a new product, plaintiffs acquired exclusive distribution rights to that product.  (Id.).  Generally speaking, in the context of a contract for the sale of goods, "it is not a prerequisite to the admissibility of testimony . . . that the wording of the contracts be ambiguous." Campbell v. Hostetter Farms, Inc., 380 A.2d 463, 466 (Pa. Super. Ct. 1977).  The Campell decision also observed, however, that when evidence of course of dealing is inconsistent with express terms in the agreement, the express terms control.  Id.  In any event, because the instances cited by plaintiffs do not tend to establish that plaintiffs acquired exclusive distribution rights to each product that S-L Distribution was

authorized to distribute, the court need not determine whether the course of dealing is consistent with the agreements.[6]

Plaintiffs allege that on occasions before and after the merger, when Snyder's acquired a new product, it was designated as an Authorized Product and plaintiffs became authorized to distribute it. (Id.). Specifically, plaintiffs direct the court to a memorandum received in 2012 which advised that three Cape Cod brand products would be moved to the S-L Distribution routes, (Doc. 31-1), and another product rollover sometime thereafter, where plaintiffs became authorized to distribute other Lance Products, including Honey Toasted Peanuts, Salted Peanuts, Dry Roasted Almonds, and others. (Doc. 31 at ¶ 70). Plaintiffs assert that this course of dealing establishes that whenever S-L Distribution received a new product for distribution, it automatically became an Authorized Product for which plaintiffs had exclusive distribution rights. (Doc. 37 at 17). This allegation is controverted by the very document that plaintiffs attach to their pleading, which states that while certain

---

[6] In support of this position, plaintiffs also rely on Last Time Beverage v. F & V Distribution, 98 A.3d 947 (N.Y. App. Div. 2012), where distributor plaintiffs sued a franchisor for violating their exclusive distributorship agreements by selling newly acquired products to customers directly. Id. at 951-52. The limited precedential value of this New York decision notwithstanding, the case is inapposite. There, the court preliminarily found that the agreements were ambiguous, and thus concluded that evidence of custom was admissible and necessary in order to define the unexplained terms of the agreement. Id. Here, the court has already concluded that the terms of plaintiffs' agreements are unambiguous and indeed unequivocal in establishing the scope of plaintiffs' exclusive contractual rights. Thus, to the extent plaintiffs' rely on Last Time in support of their claims, the court concludes that the decision is inapplicable.

enumerated products will be rolled over to plaintiffs, "this move should not be interpreted to have any meaning beyond the above-stated, as we will continue to distribute the remainder of all items in our existing distribution configuration, utilizing S-L routes as well as maintaining current relationships with 3rd party distributors." (Doc. 31-1). Thus, the plaintiffs' own exhibit, assumed true as it must at this juncture, directly refutes plaintiffs' assertion that they had any reasonable expectation of receiving the full Snyder's-Lance portfolio for distribution. For this additional reason, the court is compelled to dismiss plaintiffs' amended complaint.

## IV. <u>Conclusion</u>

For the foregoing reasons, the court will grant S-L Distribution's motion (Doc. 11) to dismiss Count I of the plaintiffs' amended complaint. Further, because the court has concluded that plaintiffs do not have an exclusive right to distribute the Snyder's-Lance products and that purported right is the entire basis of the plaintiffs' request for declaratory judgment in Count II, the court is compelled to dismiss that claim as well. While the court harbors doubt as to plaintiffs' ability to cure the pleading deficiencies identified herein, dismissal will be without prejudice and with leave to amend. An appropriate order follows.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:      October 17, 2013